No. 17-3111

## In the
# United States Court of Appeals
## for the Sixth Circuit

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

# JOHNATHAN HOLT,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Southern District of Ohio
No. 2:14-cr-127 (Marbley, J.)

---

**BRIEF FOR PLAINTIFF-APPELLEE UNITED STATES**

---

For the Appellee:

BENJAMIN C. GLASSMAN
United States Attorney

KIMBERLY ROBINSON
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
(614) 469-5715

# TABLE OF CONTENTS

Table of Authorities.......................................................................... iii

Statement Regarding Oral Argument.................................... vii

Statement of Jurisdiction ......................................................... 1

Issues Presented ......................................................................... 2

Statement of the Case................................................................ 3

     I.   The Enterprise and Holt's Role................................... 3

     II.  The Murder of Quincy Battle...................................... 9

     III. The Investigation....................................................... 11

     IV. The Trial ................................................................... 13

Summary of the Argument..................................................... 17

Argument..................................................................................... 21

I.     Holt's interview was non-custodial, so *Miranda* warnings were unnecessary. ..................................................................... 21

II.    There was sufficient evidence to support Holt's conviction for murder in air of racketeering ........................................... 31

     A.   Introduction: Relationship between VICAR and RICO........ 31

     B.   Elements of murder in aid of racketeering............................ 34

          1.   Enterprise................................................................... 36

          2.   Racketeering............................................................... 37

3.    Murder ................................................................ 38

4.    Purpose .............................................................. 38

    a.    Maintaining or increasing position or gaining entrance ................................................... 39

    b.    Pecuniary value from an enterprise ......................... 43

C.    Evidence in support of Holt's conviction ................................ 46

1.    It is undisputed that there was sufficient evidence of the non-purpose-related elements: enterprise, racketeering activity, and murder .................................. 46

    a.    Enterprise and racketeering activity ...................... 46

    b.    Murder ................................................................ 47

2.    The evidence was sufficient for a jury to conclude that Holt committed the murder with the necessary purpose .............................................................. 48

    a.    Maintaining or increasing position or gaining entrance ................................................... 48

    b.    Pecuniary value from the enterprise ........................ 52

Conclusion ......................................................................... 54

Certificate of Compliance ..................................................... 55

Designation of Relevant District Court Records ..................... 56

Certificate of Service .......................................................... 57

# TABLE OF AUTHORITIES

Cases:

*Boyle v. United States*, 556 U.S. 938 (2009)......................................36, 43

*Chapman v. California*, 386 U.S. 18 (1967)..............................................29

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989) ...............................32

*Jackson v. Virginia*, 443 U.S. 307 (1979)..................................................31

*Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003)....................................26

*Oregon v. Mathiason*, 429 U.S. 492 (1977)...............................................23

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985)......................32

*Stansbury v. California*, 511 U.S. 318 (1994)...................................21, 29

*United States v. Alexander*, 540 F.3d 494 (6th Cir. 2008)....................21

*United States v. Anglian*, 784 F.2d 765 (6th Cir. 1986) .................28, 29

*United States v. Applins*, 637 F.3d 59 (2d Cir. 2011..............................41

*United States v. Bazemore*, 77 F. App'x 110 (3d Cir. 2003)..................28

*United States v. Bennett*, 27 F. App'x 431 (6th Cir. 2001)....................23

*United States v. Bracy*, 67 F.3d 1421 (9th Cir. 1995)......................33, 37

*United States v. Brady*, 26 F.3d 282 (2d Cir. 1994) .........................40, 42

*United States v. Carson*, 455 F.3d 336 (D.C. Cir. 2006)............39–40, 52

*United States v. Clark*, No. 93-5245, 1993 WL 533562
    (6th Cir. Dec. 20, 1993) ...................................................................26

*United States v. Conception*, 983 F.2d 369 (2d Cir. 1992)............passim

*United States v. Cornell*, 780 F.3d 616 (4th Cir. 2015)........................ 41

*United States v. Corrado*, 227 F.3d 543 (6th Cir. 2000)...................... 46

*United States v. Ellison*, 791 F.2d 821 (10th Cir. 1986)...................... 26

*United States v. Feliciano*, 223 F.3d 102 (2d Cir. 2000)......41–42, 45, 50

*United States v. Gambino*, Nos. 95-1223, 95-2720 1996, WL 281597 (2d Cir. May 15, 1996).................................................. 41

*United States v. Godwin*, 765 F.3d 1306 (11th Cir. 2014).............. 33, 41

*United States v. Gray*, 137 F.3d 765 (4th Cir. 1998)...................... 35, 44

*United States v. Hackett*, 762 F.3d 493 (6th Cir. 2014)....................... 39

*United States v. Hemmings*, 64 F. App'x 68 (9th Cir. 2003)............... 29

*United States v. Ivy*, 165 F.3d 397 (6th Cir. 1998)................................. 21

*United States v. Lawson*, 535 F.3d 434 (6th Cir. 2008)....................... 33

*United States v. Lee*, 660 F. App'x 8 (2d Cir. 2016)........................ 38, 42

*United States v. Luck*, 852 F.3d 615 (6th Cir. 2017)........................... 27

*United States v. Macklin*, 900 F.2d 948 (6th Cir. 1990)...................... 22

*United States v. Mahan*, 190 F.3d 416 (6th Cir. 1999)........................ 25

*United States v. Mapp*, 170 F.3d 328 (2d Cir. 1999).................38–39, 53

*United States v. McConer*, 530 F.3d 484 (6th Cir. 2008)..................... 30

*United States v. Meadows*, 571 F.3d 131 (1st Cir. 2009)..................... 27

*United States v. Mercado*, 270 F. App'x 23 (6th Cir. 2008).................. 44

*United States v. Mongol Nation*, 693 F. App'x 637 (9th Cir. 2017)..36, 41

*United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011)...............40, 44, 52

*United States v. Muyet*, Nos. 98-1421 et al., 2000 WL 1275925
    (2d Cir. Sept. 8, 2000)....................................................35–36, 44, 54

*United States v. Odum*, 878 F.3d 508 (6th Cir. 2017) ..................passim

*United States v. Owens*, 426 F.3d 800 (6th Cir. 2005)........................... 31

*United States v. Panak*, 552 F.3d 462 (6th Cir. 2009)...............22, 24, 25

*United States v. Protsman*, 74 F. App'x 529 (6th Cir. 2003)................. 23

*United States v. Radabaugh*, No. 86-3459, 1988 WL 12801
    (6th Cir. Feb. 22, 1988).................................................................... 28

*United States v. Salvo*, 133 F.3d 943 (6th Cir. 1998)......................22, 25

*United States v. Sivils*, 960 F.2d 587 (6th Cir. 1992) ........................... 22

*United States v. Tummins*, 517 F. App'x 342 (6th Cir. 2013)...22–23, 26

*United States v. Turkette*, 452 U.S. 576 (1981) ...................................... 31

*United States v. Washington*, 318 F.3d 845 (8th Cir. 2003)...........43–44

Statutes:

18 U.S.C. § 924(j) ...................................................................................... 1

18 U.S.C. § 1958........................................................................................ 43

18 U.S.C. § 1959................................................................passim

18 U.S.C. § 1961........................................................................37

18 U.S.C. § 1962................................................................passim

18 U.S.C. § 3231...........................................................................1

28 U.S.C. § 1291...........................................................................1

Other Authority:

Fed. R. Crim. P. 29 ....................................................................50

## STATEMENT REGARDING ORAL ARGUMENT

The briefs and the record adequately set forth the facts and legal arguments of the parties. Oral argument is therefore unnecessary.

# STATEMENT OF JURISDICTION

The district court had jurisdiction over the underlying criminal case under 18 U.S.C. § 3231 because Johnathan Holt was charged with federal crimes including murder in aid of racketeering, *see* 18 U.S.C. § 1959(a)(1), and murder through the use of a firearm during and in relation to a drug trafficking crime, *see* 18 U.S.C. § 924(j). A jury found Holt guilty of both charges. The district court entered judgment against Holt on January 27, 2017. Holt filed a timely notice of appeal. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

I.    Did the district court properly conclude that Holt's interview was non-custodial for the purpose of *Miranda*?

II.   Was there sufficient evidence to find that Holt murdered Battle (A) to maintain or increase his position in, or to gain entrance to, the enterprise comprised of members and associates of the Short North Posse, or (B) as consideration for receiving something of pecuniary value from the enterprise comprised of members and associates of the Short North Posse?

## STATEMENT OF THE CASE

The murder charges here stemmed from Johnathan Holt's actions in an attempted robbery: Holt entered a marijuana dealer's home with his gun raised; after the dealer lunged, Holt shot him. Holt, who participated in the robbery under the direction of a member of the Short North Posse, was charged with 19 other members and associates of the gang. Holt was convicted after trial and sentenced to life in prison.

### I.  *The Enterprise and Holt's Role*

For years, a violent criminal enterprise controlled the drug trade in the Short North neighborhood of Columbus, Ohio. (R. 1346-1, Stipulation, 14087-88; *see* R. 1524, Trial Transcript, 16202-03 (instructing jury on stipulation); *id.* at 16233-34 (agreeing to admit stipulation).) The enterprise, comprised of members and associates of a gang called the Short North Posse, had a ruthless approach to outsiders: Members and associates of the Short North Posse sold drugs "with impunity" within the neighborhood, while non-approved dealers who ventured into the same territory were threatened or shot. (R. 1346-1, Stipulation, 14087.) Without local competition, the enterprise enjoyed a reliable customer base for the sale of cocaine, marijuana, and other

drugs. (*Id.*) Over time, gang affiliations within the enterprise evolved—some people began to identify as members of sub-groups called "Cut Throat" and "Homicide Squad"—but the unifying mission remained the same: Sell drugs, make money, and kill anyone who got in the way. (*Id.* at 14087-90.)

Although the distribution of controlled substances was the "primary income producing venture" of the enterprise, its violent and criminal acts extended beyond drug dealing and the borders of the Short North neighborhood. (*Id.*) One important extra-territorial activity was robbery. (*Id.* at 14087-90.) Robberies served an important purpose of the enterprise—"[e]nriching its members and associates." (*Id.* at 14086.) Robberies also advanced the interests of individual participants: Because the enterprise "had an informal structure"—both gang members and associates undertook its criminal activities, benefited from its protection, and were subject to its discipline—"status and respect were acquired in large part by the commission of acts of violence, the accumulation of money, narcotics or sources of narcotics." (*Id.* at 14086, 14090; *see also* R. 1520, Trial Transcript, 15597.)

To assist with these robberies and provide the manpower for "the expansion of their criminal activity," members of the Short North Posse recruited associates from outside the Short North. (*Id.* at 14087, 14089.) Lance Reynolds, a member of Cut Throat, was the "orchestrator" for a series of extra-territorial robberies, and he relied on associates from other neighborhoods—including Johnathan Holt. (R. 1520, Trial Transcript, 15526, 1530-31; R. 1521, Trial Transcript, 15757-58.) Beginning around 2009, Holt, nicknamed "Dough Boy," became Reynolds' "aggressor" during robberies. (R. 1521, Trial Transcript, 15764-69.) In this role, Holt "would be the one that run up on you, shoot you or stick you up." (*Id.* at 15762.) As was common among members of Cut Throat, Reynolds—who had many drug trafficking contacts—often chose to rob drug dealers. (*See id.* at 15759, 15764-69; R. 1520, Trial Transcript, 15595; *see also* R. 1346-1, Stipulation, 14086 (discussing the importance in the enterprise of accumulating "sources of narcotics").)

Reynolds' reputation for these robberies, and his status as a member of the Short North Posse, preceded him. Around a year before the Battle murder, Holt arranged for a childhood friend, Christopher Wharton, to participate in the robberies. (R. 1520, Trial Transcript,

15526; 15530-31.) Wharton grew up east of downtown Columbus, near where the Battle murder was committed; the Short North neighborhood is north of downtown. (*Id*. at 15525, 15553.) Wharton "wanted some money" and sought an introduction to Reynolds, because "everybody knows they rob people." (*Id*. at 15526, 15530-31, 15534-35, 15601.) Wharton first sought to join the robbery of a Check into Cash; the robbery involved both Reynolds, whom Wharton knew to be a member of the Short North Posse, and Andre Brown, another person whom Wharton identified as a member or associate of the Short North Posse. (*Id*. at 15527-30; *see also* R. 1346-1, Stipulation, 14085 (identifying Brown as a part of the enterprise comprised of members and associates of the Short North Posse).) Holt, who told Wharton that his participation in this robbery was not needed, himself received $300 for being available with a possible getaway car. (*Id*. at 15530.)

Around a year before the Battle murder, Wharton got his chance to join the crew: He was with Holt when Reynolds called to announce plans for the robbery of a marijuana "grow house" that Reynolds had identified. (*Id*. at 15530 ("[M]e and Johnathan was just chilling and Lance called him for something. And that's when I got in, and it just so

6

happened to be a robbery on a grow house."), 15534.) Holt, consistent with his reputation as an enforcer, carried a firearm during the robbery and supplied one to Wharton. (*Id.* at 15535.) The robbery yielded trash bags full of marijuana. (*Id.* at 15538.) After the robbery, Ishmael Bowers, whom Wharton identified as "affiliated with the Short North Posse," asked for some of the marijuana; Reynolds rejected his request because he had not participated in the robbery. (*Id.* at 15538-39 ("[W]hen we show him the weed in the bag, he say, give me some. Lance is like, no, because you didn't want to hit it, and we pulled off."); *see also* R. 1521, Trial Transcript, 15757, 15763-65.)

In the period before the Battle murder, Bowers was another regular in robberies in which Holt was the aggressor and Reynolds organized. (R. 1521, Trial Transcript, 15756-57, 15765.) Bowers identified these robberies as ones that he did "with the Short North Posse." (*Id.* at 15757.) Bowers testified that Reynolds was "the orchestrator" and the person who chose the targets. (*Id.* at 15757, 15761 ("He would do his homework and watch people.").) Bowers identified his own role in robberies "with the Short North Posse" as "the one to go

through the window" or "the one that go through the door last." (*Id*. at 15757.)

In this same period before the Battle murder, Holt's participation in robberies organized by Reynolds was frequent and often lucrative. In one, Holt, Reynolds, Wharton, and Bowers broke into the house of a target from the Short North and took four ounces of cocaine, splitting it up afterwards. (R. 1521, Trial Transcript, 15765 ("We all was together. We was a team. We all share everything equally.").) In another, Holt, Reynolds, Wharton, Bowers, and Roddriccos Kenney broke into a marijuana dealer's condominium and took electronics and marijuana; Reynolds had directed them to the house. (*Id*. at 15766-67; *see* R. 1520, Trial Transcript, 15552-54.) In another, with Reynolds and Bowers observing, Holt pulled his gun on the same drug dealer—whom Reynolds had found—and took $2,500 in cash, along with the dealer's scarf and sunglasses; the three associates split the money between them. (R. 1521, Trial Transcript, 15768-69 (testifying that they were able to find the dealer in his car because "Lance was good at what he does. He finds people.").) And in still another, Reynolds, Holt, and

Wharton attempted to rob a Family Dollar; after the teller failed to open the register, Holt hit her with his gun and left. (*Id.* at 15541-45.)

## II. *The Murder of Quincy Battle*

By March 2010, Reynolds had identified a new target: Quincy Battle, a marijuana dealer who lived on the east side of Columbus. (R. 1520, Trial Transcript, 15551-52, 15562-63; R. 1521, Trial Transcript, 15771.) Reynolds planned the robbery with information from "someone on the inside" of Battle's operations. (R. 1520, Trial Transcript, 15546, 15563; R. 1521, Trial Transcript, 15770.) Reynolds told Bowers that "he had a lick"—a robbery—"for 15 pounds of weed." (R. 1521, Trial Transcript, 15761, 15770.) Reynolds and Bowers went to Battle's house and "scoped it out a couple times" to "[w]atch[] his movements to see when is the best time to go in his house" and discover "how much money he's making." (*Id.* at 15771.)

On March 24, Reynolds heard a complaint that gave him a chance to send someone into Battle's house: Wharton needed somewhere to buy marijuana. (R. 1520, Trial Transcript, 15551-52.) Reynolds drove Wharton to Battle's home, where Wharton bought the marijuana he needed. (*Id.*) Later that day, Holt and Reynolds contacted Wharton and

9

told him "to go back over there" and "go in and see who in there so they can go in there and rob it." (*Id*. at 15551-52.) Reynolds and Holt soon arrived in separate vehicles at Wharton's house; Wharton got into Holt's car, joining Roddriccos Kenney. (*Id*. at 15552-54.) The four associates met up in an alley near Battle's house so that Reynolds could give them instructions. (*Id*. at 15554-55.) Reynolds, who "was the one that put it together," told Wharton "what he need me to do"—"just go in there, see what's in there and come back out." (*Id*. at 15555.) Wharton remained in the alley, serving as the lookout. (*Id*.) Holt planned to come into the house after Wharton. (*Id*.)

Wharton then entered the house for the second time that day, posing as a customer. (*Id*. at 15556-58.) After Wharton had been in the house a while—he had handed over some money and was waiting in the front room—Holt burst in with his face covered and gun raised, "telling everybody to get down." (*Id*. at 15556-59.) Battle did not comply: He grabbed Holt's wrist and began wrestling for the gun. (*Id*. at 15559-60.) Wharton shot Battle, and then Holt shot Battle. (*Id*. at 15561; R. 1521, Trial Transcript, 15775.) Holt, Wharton, and Kenney—who, like Reynolds, had remained outside the whole time—fled in Holt's car

10

before the police arrived. (R. 1520, Trial Transcript, 15561-62.)

Reynolds disappeared on his own. (*Id.* at 15562.) Battle died soon after.

(*Id.* at 15567; R. 1521, Trial Transcript, 15628-29.) Reynolds later

learned from his inside man that the marijuana had been in the couch.

(R. 1520, Trial Transcript, 15562-63 (". . . I guess he had a person on the

inside that was setting it up the whole time. So that's how he knew that

we missed all the weed.").)

### III.    *The Investigation*

Four years later, prosecutors obtained a subpoena commanding

Holt to appear at the federal courthouse in Columbus, Ohio for a DNA

sample, fingerprints, and a photograph. (R. 1090, Suppression

Transcript, 8747-48, 8752.) The Battle murder had remained unsolved

for years, but investigators had learned that a man nicknamed

"Doughboy" was involved, and they eventually matched Holt with the

nickname. (*Id.* at 8747.) Investigators planned to check Holt's DNA

sample against DNA found on a dollar bill left at the murder scene. (*Id.*)

Holt appeared at the courthouse as directed, and a police officer

met and accompanied him to the U.S. Attorney's satellite office

upstairs. (*Id.* at 8750-51, 8796-98.) Although Holt was in in a

wheelchair at the time, he was able to propel the wheelchair into the office himself. (*Id*. at 8754-56.) After Holt entered the office, a prosecutor "told him [] that the only thing he's required to do is the photograph and a DNA" and that "he's free to leave after doing that"— "[h]e can leave any time he wants to." (*Id*. at 8751; *see also id*. at 8756.) The prosecutor indicated that he "may ask him some questions" but that Holt "doesn't have to" answer them and "has the right to remain silent, and he can't be compelled to say anything." (*Id*.) The prosecutor also told Holt that he had a right to an attorney. (*Id*.) The other investigators present included one federal and two state law enforcement officials, and occasionally a second prosecutor. (*Id*. at 8755.) Although a police officer brought a recording device to the interview, he discovered that the battery on his recording device was dead, and no recording was made. (*Id*. at 8812.)

Early on in the interview, Holt gave a partial confession: He admitted that he had at some point been in possession of a .22 that matched shell casings found at the murder scene, and he indicated that he had done reconnaissance for the robbery. (*Id*. at 8753.) The prosecutors, still hoping to use Holt as a witness against his co-

defendants, told him to leave and said that "he needs to get an attorney and talk to an attorney and tell the attorney the truth because he's not telling us the truth." (*Id.* at 8754 (prosecutor recounting that "I wanted to have somebody we could use in court").) Holt pulled his shirt over his head, then "started rubbing his head and said, 'Okay, let's start over,' and he told a second story," and eventually a third. (*Id.* at 8759; *see* R. 1521, Trial Transcript, 15654-60.) In the final version, Holt said that he went to the house with Reynolds to commit a robbery but did not enter. (R. 1521, Trial Transcript, 15664.) During the interview, Holt never indicated that he was uncomfortable or that he wanted to leave. (R. 1090, Suppression Transcript, 8759, 8804.) He was never restrained. (*Id.* at 8759, 8804.)

IV.    *The Trial*

The grand jury charged Holt with murder in aid of racketeering, *see* 18 U.S.C. § 1959(a)(1), and murder with a firearm during a drug trafficking crime, *see* 18 U.S.C. § 924(j). (R. 300, Superseding Indictment, 1204-07.) The grand jury also charged Holt with cocaine and firearm offenses in connection with conduct on a different date; these charges were dismissed before trial upon motion by the United

13

States. (R. 1324, Motion to Dismiss Counts 17 and 18, 13966; R. 1328, Order, 13975.)

Holt filed a pre-trial motion to suppress his statements to investigators, arguing that the interview was custodial and that the absence of a full *Miranda* warning amounted to a constitutional violation. (R. 612, Motion to Suppress, 2564, 2567.) At the suppression hearing, the court heard testimony from a prosecutor and two police officers who were present during the interview. (R. 1090, Suppression Transcript, 9746, 8794, 8807.) The court later denied the motion, crediting the prosecutor's testimony and holding that the interview was not custodial. (R. 775, Order, 3575, 3584.) The motion to suppress was renewed during trial, and again denied, with the court finding that "on the record before me, he understood that he was free to leave." (R. 1521, Trial Transcript, 15697.)

During a four-day trial, the United States presented eyewitness and forensic evidence detailing Holt's role in the Battle murder: Wharton testified that he and Holt each shot Battle, and that Holt alone carried a .22 during the crime (R. 1520, Trial Transcript, 15561); a police officer testified that investigators found shell casings from a .22

14

at the murder scene and later recovered a .22 that matched the casings (R. 1521, Trial Transcript, 15637-38, 40-48); and an acquaintance of Holt testified that he bought Holt the .22 that matched the casings from the murder scene (R. 1520, Trial Transcript, 15468-71). A stipulation signed by Holt (1) conceded the existence of an enterprise, comprised of members and associates of the Short North Posse, that was engaged in racketeering activity (R. 1346, Stipulation, 14085, 14092-91); (2) admitted that robberies were a racketeering activity of the enterprise (*id.* at 14092-91); and (3) described how "Short North Posse members often traveled outside its general territory to . . . find targets for robbery" and indicated that they "would recruit associates outside the Short North area in order to assist with the expansion of their criminal activity" (*id.* at 14088-89). And Wharton and Bowers described Holt's participation in other robberies organized by Reynolds. (R. 1520, Trial Transcript, 15552-54; R. 1521, Trial Transcript, 15765-69; *see also* R. 1520, Trial Transcript, 15564 (Wharton contrasting the Holt/Reynolds robberies with a later incident in which Holt was shot: "That one was on his own, though.").)

At the close of evidence by the United States, Holt moved for acquittal under Rule 29 of the Federal Rules of Criminal Procedure; the district court denied his motion. (R. 1524, Trial Transcript, 16079-91.) When describing the evidence in support of murder in aid of racketeering, the district court noted that the attempted robbery of Battle's house matched the criminal activities of the enterprise:

> If the jury believed the testimony of . . . Christopher Wharton or Ishmael Bowers, it could conclude that they all knew that . . . Mr. Reynolds set up these robberies, that it was the MO of the Short North Posse and Mr. Reynolds, as a part of the Short North Posse, to rob drug dealers. And so, when they went to the Battle residence, that was the point of it. So a jury could believe that.

(*Id.* at 16091.) Following the denial of the motion, Holt did not call any witnesses. (*Id.* at 16111.)

The jury found Holt guilty of both counts. (R. 1413, Judgment, 14397-98.) The district court imposed a life prison term for murder in aid of racketeering and a 25-year prison term for murder with a firearm during a drug trafficking crime; the court ordered the terms to be served consecutively. (R. 1413, Judgment, 14398.) Holt timely appealed. (R. 1417, Notice of Appeal, 14433.)

## SUMMARY OF THE ARGUMENT

Johnathan Holt shot marijuana dealer Quincy Battle during an attempted robbery. Lance Reynolds, a member of the Short North Posse, organized the robbery: He selected the target, recruited participants, and served as a lookout. Prior to the murder, Holt had taken part in other robberies organized by Reynolds.

Holt does not dispute the sufficiency of these facts. Instead, he (1) challenges the admission of his statements to investigators, in which he acknowledged that he participated in the robbery; and (2) argues that the evidence is insufficient to support the purpose element of murder in aid of racketeering, *see* 18 U.S.C. § 1959(a)(1). In support of (1), Holt argues that he was in custody when he made the statements, so that a full *Miranda* warning was required. In support of (2), Holt argues that evidence was insufficient to show that he murdered Battle (A) to maintain or increase his standing among "members and associates of the Short North Posse," which is the enterprise here, or to gain entrance to the same enterprise, or (B) to obtain something of pecuniary value from the same enterprise.

17

(1) The evidence demonstrates that Holt was not in custody: He was never arrested or restrained, and a prosecutor told him before the interview that he did not have to answer questions, was entitled to a lawyer, and was free to leave. Although Holt criticizes the failure of to record the interview, he does not contest the investigators' account of his statements or the basic sequence of events concerning the interview, and the failure does not make the interview custodial. Further, in light of the overwhelming evidence of Holt's participation in the murder, any error in admitting the statements was harmless.

(2) There was sufficient evidence for a jury to conclude that Holt committed the offense either (A) to maintain or increase his position in the enterprise, or to gain entrance into the enterprise, *or* (B) for compensation from the enterprise.

(A) The evidence demonstrated that the attempted robbery of Battle, and the related robberies conducted by Holt and Reynolds, were activities of the enterprise. First, the attempted robbery of battle shared the same essential characteristics as robberies identified in the stipulation as activities of the enterprise: The stipulated enterprise robberies, like the Battle attempt, took place outside the Short North,

were organized by a member of the Short North Posse, involved participants who were not from the Short North, and targeted drug dealers. Second, even without reference to the stipulated robberies, the jury was entitled to conclude that the attempted robbery was an activity of the enterprise. It was organized by a member of the Short North Posse and conducted by him and associates of the Short North Posse. The participants knew that Reynolds was a member of the Short North Posse. And the attempt was part of a series of similar robberies—a majority of which were armed home invasions in Columbus, and a majority of which targeted drug dealers—conducted by members or associates of the Short North Posse. Third, because the other Holt/Reynolds robberies shared the same essential characteristics, they were also activities of the enterprise.

There was sufficient evidence for the jury to conclude that Holt, who served as an "enforcer" in the Battle crime and related robberies, knew his participation was expected and participated to maintain or increase his position within the enterprise. And even if the jury concluded that he did not have a position within the enterprise,

testimony by Wharton and others provided sufficient evidence to conclude that he participated to gain such a position.

(B) The jury could reasonably conclude that Holt participated in the murder and attempted robbery for compensation, given evidence that Reynolds organized the robbery and that Holt received compensation for previous robberies arranged by Reynolds. And as described above, the jury was also entitled to conclude that Holt's compensation was *from the enterprise*, because Reynolds was an undisputed member of the enterprise, and the Battle robbery was an activity of the enterprise.

# ARGUMENT

## I.  Holt's interview was non-custodial, so *Miranda* warnings were unnecessary.

In a review of the denial of a motion to suppress, this Court reviews findings of fact for clear error and conclusions of law de novo. *United States v. Alexander*, 540 F.3d 494, 500 (6th Cir. 2008). A credibility finding by the district court "carries considerable weight" because "[f]indings of fact anchored in credibility assessment are generally not subject to reversal upon appellate review." *United States v. Ivy*, 165 F.3d 397, 401 (6th Cir. 1998) (internal quotations omitted).

The Fifth Amendment requires law enforcement officials to give *Miranda* warnings before custodial interviews. *Stansbury v. California*, 511 U.S. 318, 322 (1994). An interview is custodial if "a formal arrest" occurred or if there was a "restraint on freedom of movement of the degree associated with a formal arrest." *Id.* Courts evaluate the degree of restraint by looking at the "objective circumstances of the interrogation" and asking "how a reasonable person . . . would gauge the breadth of his or her 'freedom of action.'" *Id.* at 325. The "objective circumstances" include "the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained

freedom of movement during the interview; and whether the individual was told she need not answer the questions." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009).

An "important factor" in finding that an interview was non-custodial is any statement to the interviewee that he is free to leave. *United States v. Salvo*, 133 F.3d 943, 951 (6th Cir. 1998) (finding an interview non-custodial where, "most significantly," the interviewer told the interviewee that "he was not under arrest, that he was free to leave at any time, and that he would not be arrested at the conclusion of the interview"); *see also United States v. Sivils*, 960 F.2d 587, 598 (6th Cir. 1992). In a case in which the interviewer tells the defendant he is free to leave, this Court often views the "free to leave" communications as dispositive. *See United States v. Macklin*, 900 F.2d 948, 951 (6th Cir. 1990) ("holding that "[t]he record would not support" a finding that the interview was custodial where the interviewer "repeatedly told the defendants that they were not under arrest and that they were free to cut off his questioning at any point"); *United States v. Tummins*, 517 F. App'x 342, 344 (6th Cir. 2013) ("Where an officer tells a suspect that he or she is not under arrest, we have tended to find that the suspect was

not in custody."); *United States v. Protsman*, 74 F. App'x 529, 535 (6th Cir. 2003) ("[T]he interviewing officer's subsequent statements at the beginning of the interview—that he was free to leave if he wanted— negated any idea that the interview was custodial in nature"); *United States v. Bennett*, 27 F. App'x 431, 435 (6th Cir. 2001) ("[The] explicit directive that the Bennett was free to leave at any time, found credible by the lower courts, makes it difficult to believe that a reasonable person would have felt that he or she were under arrest.").

A statement that the defendant is free to leave or not under arrest simplifies the custody analysis even when the interview takes place in a police station. In *Oregon v. Mathiason*, for example, the Supreme Court held that "there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way" where the defendant, who was interviewed for half an hour, "came voluntarily to the police station, where he was immediately informed that he was not under arrest." 429 U.S. 492, 495 (1977).

Here, an interviewer's multiple statements about Holt's freedom to leave "make[] it difficult to believe that a reasonable person would have felt that he or she were under arrest." *Bennett*, 27 F. App'x at 435.

23

After Holt entered the United States Attorney's office, a prosecutor told him in unambiguous terms that he was free to leave:

> I told him that the only thing he's required to do is the photograph and a DNA. I told him that he's free to leave after doing that, that . . . I may ask him some questions. If he wants to answer them, he can. He doesn't have to. He can leave any time he wants to. He has a right to an attorney. He has the right to remain silent, and he can't be compelled to say anything. And I wanted to make sure that he knew that and realized that he didn't have to stay.

(R. 1090, Suppression Transcript, 8751; *see also id.* at 8756.) Later, the prosecutor went so far as to actually advise Holt to leave and get an attorney. (*Id.* at 8754, 8806.) These statements, which were credited by the district court, demonstrate that Holt was not in custody.

The other "objective circumstances" considered by this Court confirm that Holt was not in custody. *See Panak*, 552 F.3d at 465. First, Holt had "unrestrained freedom of movement." *Panak*, 552 F.3d at 465. It is undisputed that he was never arrested or restrained during the interview. (R. 1090, Suppression Transcript, 8755, 8758-59; 8796-8799, 8804; *see* Holt Brief at 35.) It is also undisputed that Holt never indicated that he was uncomfortable or wanted to leave and that he ultimately left without being arrested. (R. 1090, Suppression Transcript, 8804.) Although Holt now argues that he was "unable to

push or wheel himself" (Holt Brief at 35), the testimony contradicts him: The prosecutor testified that Holt was able to maneuver the wheelchair himself, and that he wheeled himself in to the office where the interview took place; Holt's girlfriend indicated that, while "it was a struggle" for him to propel himself, he could in fact do it. (R. 1090, Suppression Transcript, 8755-56; 8791.) Although testimony by Holt's girlfriend conflicts partially with the testimony of the prosecutor—the girlfriend indicated that someone helped Holt enter the office—it does not ultimately demonstrate that he was unable to move or had any restrictions during the interview. (*Id.* at 8791-92.)

Second, as described above, Holt was told not only that he was free to leave but that he need not answer any questions. (*Id.* at 8751.) *See Panak*, 552 F.3d at 465; *Salvo*, 133 F.3d at 951.

Third, the interview, which lasted an hour and forty-five minutes, was not long enough to weigh in favor of custody, and there was no indication that the manner of questioning was aggressive or intimidating. In *United States v. Mahan*, this court held that an interview was non-custodial where it "lasted *only* an hour and a half." 190 F.3d 416, 423 (6th Cir. 1999) (emphasis added). And this Court has

upheld longer interviews without suggesting that their length cut against the holding. *See Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003) (holding that a four-hour interview was not custodial); *United States v. Tummins*, 517 F. App'x 342, 344 (6th Cir. 2013) (holding that two-hour interview was not custodial).

Fourth, the location of the interview—the United States Attorney's Office in the courthouse—did not render it custodial. *See United States v. Clark*, No. 93-5245, 1993 WL 533562, *1 (6th Cir. Dec. 20, 1993) (holding that interview in courthouse by police officer was non-custodial); *see also United States v. Ellison*, 791 F.2d 821, 823 (10th Cir. 1986) ("The fact that he was driven to the United States Attorney's office by a police officer did not affect his liberty to come and go as he pleased.").

Holt, resisting these conclusions, criticizes the absence of a recording. It is true that that a police officer testified that it was the policy of his department to record even non-custodial interviews, and that, due to dead batteries in a recorder, he failed to record the interview despite being aware of the policy. The district court, though it expressed strong disapproval for the lack of recording and called it "poor

judgment," correctly concluded that "[i]t doesn't rise to the level of a constitutional violation." (R. 1521, Trial Transcript, 15699-15700.) This Court has previously held that an unrecorded interview was non-custodial and noted, in the context of a related involuntary-statement claim, that a "violation by the government of its internal operating procedures, on its own, does not create a basis for suppressing" a statement. *United States v. Luck*, 852 F.3d 615, 621-24 (6th Cir. 2017) (internal quotations omitted); *see also United States v. Meadows*, 571 F.3d 131, 147 (1st Cir. 2009) (holding that even for a custodial interview, and even where there is a policy violation, "there is no federal constitutional right" to have one's interview recorded). Although the lack of a recording could have influenced the district court's findings of fact, the court found the prosecutor's testimony about the interview credible, and on appeal Holt does not advance a conflicting factual description of the interview.

Holt appears to suggest that the "free to leave" statements were not enough in light of surrounding circumstances—in particular, the fact that Holt came to the courthouse after receiving a subpoena. (Holt Brief at 37-39.) But this Court has rejected the argument that

appearing at the courthouse in response to a subpoena makes an interview custodial. *See United States v. Anglian*, 784 F.2d 765, 768-69 (6th Cir. 1986) (rejecting defendant's contention that he believed that grand jury subpoena—which was requested by the U.S. Attorney and which required him to come to police station for fingerprints and handwriting—compelled him to make a statement); *United States v. Radabaugh*, No. 86-3459, 1988 WL 12801, *2 (6th Cir. Feb. 22, 1988) ("The argument that mere service of a subpoena and initiation of questioning by a government agent constitute custodial interrogation is untenable."); *see also United States v. Bazemore*, 77 F. App'x 110, 111-14 (3d Cir. 2003).

Holt's argument is further weakened by the type of subpoena used here: the subpoena required only physical evidence—not participation in an interview—and the prosecutor specifically emphasized to Holt that the subpoena did *not* require him to answer questions. (R. 1090, Suppression Transcript, 8751, 8764 ("[W]hen anyone is subpoenaed . . . , even when it's not to testify, they were still compelled to show up or compelled to give the photograph or DNA. So I told him that's what he has to do, but I wanted to be clear that he didn't have to do anything

else.").) *See Anglian*, 784 F.2d at 768-69; *United States v. Hemmings*, 64 F. App'x 68, 69-70 (9th Cir. 2003).

Holt's citation of *Stansbury v. California*, 511 U.S. 318 (1994), also cannot save his argument. Holt, noting that the prosecutor told Holt that he "was the target of an investigation," cites *Stansbury* without explanation. (Holt Brief at 38.) But this case does not help him: This Court, applying *Stansbury*, has recognized that an officer's statement that the interviewee is a target does not render the interview custodial. *Salvo*, 133 F.3d at 952 (citing *Stansbury*). In fact, this Court has indicated that such a statement is only relevant if the defendant can show "how the fact that the officers [provided] this information actually led [the defendant] to believe he was not free to leave." *Id*. Here, Holt makes no attempt at such a showing, nor could he, in light of the prosecutor's reassurances that he could and should leave. Holt's suppression arguments therefore fail.

Finally, even if the district court erred by denying the motion to suppress, any error was harmless. *See Chapman v. California*, 386 U.S. 18, 22 (1967) (holding that some errors are "so unimportant and insignificant that they may, consistent with the Federal Constitution,

be deemed harmless"); *United States v. McConer*, 530 F.3d 484, 496 (6th Cir. 2008). Holt never actually confessed to shooting Battle—only to approaching the house to commit a robbery. And the forensic and eyewitness testimony provided overwhelming evidence confirming not only that Holt went to the house to commit a robbery, but that he did in fact shoot Battle. (R. 1520, Trial Transcript, 15561, 15468-71; R. 1521, Trial Transcript, 15637-38, 40-48). Holt therefore cannot demonstrate reversible error.

## II.  There was sufficient evidence to support Holt's conviction for murder in aid of racketeering.

On appeal, Holt challenges the sufficiency of evidence of his purpose for committing the murder.

This Court reviews sufficiency of the evidence de novo. *United States v. Owens*, 426 F.3d 800, 808 (6th Cir. 2005). The evidence is sufficient to support a conviction if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements . . . beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis original).

### A.  Introduction: Relationship Between VICAR and RICO

The offense of violent crime in aid of racketeering in 18 U.S.C. § 1959 ("VICAR")—created after the enactment of the Racketeer Influenced and Corrupt Organizations Act ("RICO")—was intended to complement the substantive racketeering offense in 18 U.S.C. § 1962. *United States v. Odum*, 878 F.3d 508, 518 (6th Cir. 2017) (citing *United States v. Conception*, 983 F.2d 369, 381 (2d Cir. 1992)). Both VICAR and RICO "seek the eradication of organized crime in the United States." *United States v. Turkette*, 452 U.S. 576, 589 (1981); *see Conception*, 983 F.3d at 518. The "organized crime" that Congress sought to eliminate

31

included criminal activities by organizations that are legitimate and illegitimate, formal and informal. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 243-49 (1989); *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985). To facilitate the goal of eradicating organized crime, sections 1959 and 1962 are both intended to "'be liberally construed.'" *Conception*, 983 F.2d at 381 (quoted in *Odum*, 878 F.3d at 518).

The complementary nature of RICO and VICAR means that each statute focuses on different behavior and motives. In particular, the creation of 1959 "allow[s] the government not only to prosecute under RICO for conduct that constitutes a pattern of racketeering activity in connection with an enterprise, but also to prosecute under § 1959 for violent crimes" committed for one of two purposes: (1) for pecuniary gain from an enterprise or (2) to gain entrance into the enterprise, or to maintain or increase the defendant's position within the enterprise. *Conception*, 983 F.2d at 380-81; *see* 18 U.S.C. §§ 1959, 1962.

In the service of their partially divergent goals, VICAR and RICO focus on different activities: VICAR is concerned with the nature of the violent act and the specified purpose of the defendant, while RICO is concerned with the existence of a pattern of racketeering activity and

the defendant's commission of such activity (or an agreement to commit such activity) in order to "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." *Compare* 18 U.S.C. §§ 1959(a) (prohibiting qualifying persons from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity" or conspiring to do the same).

These distinctions help to clarify sufficiency challenges in VICAR cases by underlining what is *not* necessary to show for VICAR. Section 1959, unlike section 1962, allows the United States to prosecute an individual who did *not* necessarily engage in or agree to engage in a pattern of racketeering activity. *Odum*, 878 F.3d at 517-18; *United States v. Bracy*, 67 F.3d 1421, 1430 (9th Cir. 1995). Section 1959, unlike section 1962, also allows the United States to prosecute an individual without knowledge of the enterprise's racketeering activities. *Odum*, 878 F.3d at 518; *compare with United States v. Lawson*, 535 F.3d 434, 443 (6th Cir. 2008); *Godwin*, 765 F.3d at 1321. And section 1959, unlike section 1962, does not require the United States to prove that an

individual "conduct[ed] or participate[d]" in the affairs of the enterprise. *Compare* 18 U.S.C. §§ 1959(a) *and* 1962.

### B. Elements of murder in aid of racketeering

An individual can be punished under VICAR for murder committed "[1] as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or [2] for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a).

As applied by this Court, the elements of VICAR murder committed to *maintain or increase* position are "(1) that the Organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise." *United States v. Odum*, 878 F.3d 508, 516 (6th Cir.

2017) (quoting *United States v. Conception*, 983 F.2d 369, 381 (2d Cir. 1992)); *see* 18 U.S.C. § 1959(b)(2) (defining enterprise).

The elements of VICAR murder committed to *gain entrance* into an enterprise are the same with two exceptions: The position requirement is omitted, and the purpose element is changed to require that the defendant acted to "gain[] entrance to" the enterprise. 18 U.S.C. § 1959(a); *compare Conception*, 983 F.2d at 381.

For compensation-motivated VICAR murder, there is no position requirement, and the purpose element is changed to require that the defendant acted "as consideration for the receipt of, or as consideration for a promise to pay, anything of pecuniary value from" a qualifying enterprise. 18 U.S.C. § 1959(a); *United States v. Gray*, 137 F.3d 765, 772-73 (4th Cir. 1998); *see also Conception*, 983 F.2d at 381, 384 (noting, in a discussion of for-consideration VICAR offenses, "that § 1959 as a whole is sufficiently inclusive to encompass the actions of a so-called independent contractor"); *United States v. Muyet*, Nos. 98-1421 et al.,

2000 WL 1275925, *1 (2d Cir. Sept. 8, 2000) (upholding the § 1959(a) conviction of a "freelancer" who committed contract murders for a gang).

Although Holt challenges the sufficiency of the evidence only regarding the purpose element, because the other elements are relevant to purpose, this brief addresses each in turn.

### 1. Enterprise

The United States satisfies the enterprise element of either type of VICAR murder by proving the existence of "any . . . group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2). An "association-in-fact," sometimes called an "enterprise-in-fact," has three characteristics: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoted in *Odum*, 878 F.3d at 516). An enterprise may be comprised of both members and non-members of a gang or criminal organization. *See, e.g., United States v. Mongol Nation*, 693 F. App'x 637, 638 (9th Cir. 2017) ("The alleged RICO 'enterprise,'

the Mongols Gang, is comprised of both Mongol Nation, i.e., the Mongols Gang's official or full-patch members, and various associates.").

### 2. Racketeering

The United States satisfies the racketeering element by showing that the enterprise engaged in "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance" that qualifies as a felony under state law, or by showing that the enterprise engaged in any act that qualifies as one of several listed federal felony offenses. 18 U.S.C. § 1961(1); *see* 18 U.S.C. § 1959 (referring to § 1961(1) for the definition of "racketeering activity" in VICAR).

Holt incorrectly argues that the United States must show that "members of the enterprise and the associates . . . participate in conducting the affairs of the enterprise through a pattern of racketeering activity." (Holt Brief at 52-53.) The "conduct . . . [the] enterprise's affairs" and "pattern of racketeering activity" requirements are part of a substantive RICO charge but not a VICAR murder charge. *Odum*, 878 F.3d at 517-18; *United States v. Bracy*, 67 F.3d 1421, 1430 (9th Cir. 1995); *compare* 18 U.S.C. §§ 1959(a) (discussing proximity to

"an enterprise engaged in racketeering activity") *and* 1962 (prohibiting qualifying persons from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity" or conspiring to do the same). And neither statute includes the word "member": section 1959 addresses people who have a "position" in the enterprise, and section 1962 addresses people who are "employed by or associated with" the enterprise. *See* 18 U.S.C. §§ 1959(a) *and* 1962(c).

### 3. Murder

The United States may satisfy the murder element by showing that the defendant "engaged in the conduct that resulted in murder." *United States v. Mapp*, 170 F.3d 328, 335 (2d Cir. 1999) (emphasis omitted). In other words, a defendant satisfies the murder element if he committed felony murder. *Id.* at 335-36; *see also United States v. Lee*, 660 F. App'x 8, 16 (2d Cir. 2016).

### 4. Purpose

The United States satisfies the purpose element if it shows that the defendant engaged in the relevant conduct either to "gain[] entrance to or maintain[] or increas[e] position in" the enterprise or "as

consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from" the enterprise. 18 U.S.C. § 1959(a). The element is satisfied if one of these was "an animating purpose" of the defendant's actions. *United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014) (quotations omitted). The United States need not prove that the defendant "acted *solely or primarily*" with one of these purposes. *Id.* (emphasis added).

In a felony-murder case, the United States satisfies the purpose element by showing that the defendant engaged in the *underlying felony* with the requisite purpose. *Mapp*, 170 F.3d at 335.

### a. *Maintaining or increasing position or gaining entrance*

The "maintain[] or increas[e] position" requirement has been well-defined by the courts. A defendant commits a violent crime to maintain or increase his position in the enterprise where he commits the violent act "because he knew it was expected of him" in light of his position in the enterprise. *Conception*, 983 F.2d at 381. A defendant may know that a crime is expected of him if, for example, he had a reputation as a violent enforcer. *See United States v. Carson*, 455 F.3d 336, 370 (D.C. Cir. 2006) ("The jury also could have determined that Carson shot

English to maintain or increase his own reputation as an enforcer in the enterprise. The evidence showed that Carson frequently carried out violent crimes against those who threatened the organization or its members."); *United States v. Moore*, 651 F.3d 30, 98 (D.C. Cir. 2011) ("The jury reasonably could have found from the evidence that Handy committed the murder in exchange for money . . . or to maintain his status as an enforcer."). And for the "gaining entrance" requirement, it is not necessary that the crime be expected of the defendant. *See* 18 U.S.C. 1959(a); *compare Conception*, 983 F.2d at 381.

For any version of the position-related purpose, it is not necessary to show that the defendant is or wishes to become a formal member of a gang or organized crime family. *United States v. Brady*, 26 F.3d 282, 289 (2d Cir. 1994). In *Brady*, for example, the Second Circuit rejected the defendant's argument that "only a 'made member' of a crime family can hold a 'position' in an enterprise under the plain meaning" of section 1959(a). *Id*. In substantive RICO counts, the enterprise is regularly defined to include "members and associates" of a gang or criminal organization. *See* 18 U.S.C. § 1962(c) (recognizing that persons "employed by *or associated with* any enterprise" can "conduct . . . [the]

40

enterprise's affairs through a pattern of racketeering activity")
(emphasis added); *see, e.g.*, *Mongol Nation*, 693 F. App'x at 638; *United
States v. Cornell*, 780 F.3d 616, 630-31 (4th Cir. 2015); *United States v.
Godwin*, 765 F.3d 1306, 1322-23 (11th Cir. 2014); *United States v.
Applins*, 637 F.3d 59, 63 (2d Cir. 2011); *United States v. Gambino*, Nos.
95-1223, 95-2720, 1996 WL 281597, *2 (2d Cir. May 15, 1996).

Although the statute does not define the term "position," the
applicable decisions suggest that, at a minimum, a defendant has a
"position in an enterprise" if he has committed racketeering activities
that can be attributed to the enterprise under the "enterprise engaged
in racketeering activity" analysis under section 1959 or "conduct[ing]
. . . [an] enterprise's affairs through a pattern of racketeering activity"
under section 1962.

In VICAR and RICO cases, a person's racketeering activity is
attributable to the enterprise under these standards if he "'acted for the
group and/or in concert with other members, or acted in ways that
contributed to the purposes of the group, or that were facilitated or
made possible by the group.'" *Odum*, 878 F.3d at 517 (quoting *United
States v. Feliciano*, 223 F.3d 102, 117 (2d Cir. 2000)). These factors are

not the only ones that a court may consider in this context; courts perform "fact-based," case-by-case analyses to determine whether an action should be attributed to the enterprise or to an individual acting independently. *Feliciano*, 223 F.3d at 116-17.

Courts use similar fact-based analyses to discuss "position" in VICAR cases. In *United States v. Brady*, for example, the Second Circuit held that the defendant had a "position in an enterprise" where, as an "associate" of the crime family, he "commit[ted] crimes under the protection of the family." 26 F.3d at 290. And in *United States v. Lee*, the Second Circuit upheld the defendant's conviction for position-motivated VICAR murder without discussing whether he was an actual gang member, noting instead that "[t]he jury heard abundant evidence that the Crew's primary business was robbing drug dealers in order to obtain and sell drugs, which is precisely what happened in the [relevant] robbery" and where "telephone records show a likelihood of consultation with other members of the DeKalb Avenue Crew on the day of the murder." 660 F. App'x 8, 16 (2d Cir. 2016).

Holt, who does not expressly identify a standard by which this Court should determine whether he had a "position" in the enterprise,

does in his analysis imply that several incorrect standards are applicable. In particular, Holt seems to suggest that he could not have a position in the enterprise because "there is no evidence that Holt was a member of its hierarchy . . . or that he was expected to perform in accordance with any code[] [or] rules," and "there is no evidence that Mr. Holt had any 'deal' with any enterprise." (Holt Brief at 58-59.) But express agreement, formal hierarchy, and formal rules are all unnecessary for any analysis about whether an individual's actions are attributable to the enterprise, as well as any analysis about whether the overall enterprise exists. *See Boyle*, 556 U.S. at 946 (2009).

### b. *Pecuniary value from an enterprise*

An item has "pecuniary value" for the purpose of VICAR if it is "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage." 18 U.S.C. § 1958(b)(1) (referring to the use of the term in section 1959). In other words, it is not necessary that the item of pecuniary value be cash. This requirement is satisfied, for example, where the defendant committed the crime in the expectation of receiving drugs as compensation. *See United States v. Washington*,

43

318 F.3d 845, 853-54 (8th Cir. 2003); *United States v. Mercado*, 270 F. App'x 23, 24-25 (6th Cir. 2008).

To demonstrate that a defendant expected compensation "from an enterprise," it is not necessary that the defendant himself have a position in the enterprise or even be engaged with the enterprise on any other occasion. *Conception*, 983 F.2d at 381, 384 (noting that for-compensation VICAR murder can be committed by "a so-called independent contractor"); *Gray*, 137 F.3d at 772 (upholding for-compensation VICAR conviction where defendant "had been approached by a drug lord . . . with an offer of $5,000 for [the victim]'s life"); *United States v. Muyet*, Nos. 98-1421 et al., 2000 WL 1275925, *1 (2d Cir. Sept. 8, 2000) (upholding conviction of "freelancer" who committed contract murders for gang).

Courts of appeals consistently find sufficient evidence that compensation was "from an enterprise" where there is evidence that the person making the payment is a participant in an enterprise. *See Gray*, 137 F.3d at 772; *United States v. Moore*, 651 F.3d 30, 98 (D.C. Cir. 2011); *Mercado*, 270 F. App'x at 24-25; *Muyet*, Nos. 98-1421 et al., 2000 WL 1275925, *4. At a minimum, a person receives compensation "from

an enterprise" if the payor's acts can be considered a racketeering activity of the enterprise, as discussed in sections 1959 and 1962. *See Odum*, 878 F.3d at 517 (quoting *Feliciano*, 223 F.3d at 117).

Although Holt does not expressly propose an alternate standard by which this Court could distinguish enterprise activity and criminal freelancing, his discussion of the facts does imply several incorrect standards. Neither VICAR nor substantive RICO provide any support for Holt's assertion—which he does not support with references—that the payment is only from an enterprise if Reynolds is acting as an "agent" of the enterprise. And agency analysis is a poor match for the informal structure of an enterprise-in-fact.

Holt incorrectly suggests that a defendant may only be convicted of for-compensation VICAR murder if he has a position in the enterprise; he also appears to suggest that the purpose of the defendant must be related to the goals of the enterprise. (*See* Holt Brief at 61.) The language of the statute does not require either of these, and courts have rejected a position requirement in for-compensation VICAR murders. The case that Holt cites for his position/purpose proposition is a RICO case addressing the "pattern of racketeering activity" element of that

offense—an element which, as discussed previously, is not a requirement of VICAR murder. (*See id.* (citing *United States v. Corrado*, 227 F.3d 543, 554 (6th Cir. 2000).)

### C. Evidence in support of Holt's conviction

There was sufficient evidence for a jury to conclude that Holt committed the murder either (1) to maintain his position within the enterprise *or* (2) in anticipation of pecuniary gain from the enterprise.

    1. It is undisputed that there was sufficient evidence of the non-purpose-related elements: enterprise, racketeering activity, and murder.

### a. Enterprise and racketeering activity

Holt stipulated to the existence of "an enterprise engaged in racketeering activity" that affected interstate and foreign commerce. (R. 1346-1, Stipulation, 14085-91; *see* R. 1524, Trial Transcript, 16203, 16205 (instructing the jury).) The stipulation defined the enterprise as "[t]he Short North Posse, including its members and associates." (R. 1346-1, Stipulation, 14085, 14090.) The stipulation indicated that the purposes of the enterprise included "[e]nriching its members and associates through, among other things, the commission of crimes involving the distribution of controlled substances, robbery and murder

for hire, burglary, theft, and breaking and entering." (*Id.* at 14086.) The stipulation also recognized that robbery was a racketeering activity of the enterprise. (*Id.* at 14090-91.)

### b. Murder

The United States offered proof sufficient for both murder and felony murder, and Holt acknowledges that the United States presented sufficient evidence of felony murder. (*See* Holt Brief at 49-62.) In particular, Holt recognizes that the United States presented evidence indicating that he entered Battle's house with his gun raised to commit a robbery (*see id.* at 20, 22), and he recognizes that a murder was committed during the robbery (*see, e.g., id.* at 61 (referring to "the Battle robbery" and "the homicide that resulted").) The United States also presented eyewitness and forensic evidence demonstrating that Holt himself shot Battle. Wharton testified that Holt had shot Battle. (R. 1520, Trial Transcript, 15560-01, 15573.) The evidence also linked Holt to the murder weapon: an investigator testified that they recovered a .22 that matched shells found at the murder scene (R. 1521, Trial Transcript, 15637-38, 40-48), and the witness who purchased the .22

testified that he had given it to Holt (R. 1520, Trial Transcript, 15468-71.)

>    2.  The evidence was sufficient for a jury to conclude that Holt committed the murder with the necessary purpose.

Holt's stipulation, combined with trial testimony, provide ample evidence for a jury to conclude that he committed the murder *either* (A) to maintain or increase his position as an "aggressor" in the enterprise or gain entrance into the enterprise, *or* (B) for compensation from the enterprise.

>    a.  *Maintaining or increasing position or gaining entrance*

First, there was sufficient evidence for a jury to conclude that Holt had a position within the enterprise: The stipulation defined the enterprise as including both "members and associates" of the Short North Posse, and Holt fits the stipulation's description of an associate of the Short North Posse. (R. 1346-1, Stipulation, 14088.) The stipulation indicates that "associates" of the enterprise took part in robberies outside the Short North that were organized by gang members. (*Id.* at 14088-89 (noting that members of the Short North Posse "would recruit associates outside the Short North area" to help with such robberies);

48

*see also id.* at 1490-91 (recognizing that robbery was a racketeering

activity of the enterprise).) The stipulation also recognized that

members of Cut Throat and Homicide Squad "specialized in murders

and robberies of . . . other drug dealers[] and targets thought to have

large sums of cash or firearms." (R. 1346-1, Stipulation, 14087.)

The Battle robbery, as well as Holt's previous robberies, fit

squarely within this description of robberies by members and associates

of the Short North Posse. It is undisputed that Reynolds, a member of

the Short North Posse and Cut Throat Committee, was part of the

enterprise. (*See* R. 1346-1, Stipulation, 14085, 14090; R. 1521, Trial

Transcript, 15757-58.) Reynolds organized the Battle robbery, which

was the robbery of a drug dealer that took place outside of the Short

North. (R. 1520, Trial Transcript, 15551-52, 15562-63; R. 1521, Trial

Transcript, 15771.) Holt, who was not from the Short North, also

participated under Reynolds' direction in several other robberies that

took place outside the Short North, including several of other drug

dealers. R. 1521, Trial Transcript, 15757, 15761, 15765-69.)

Even if the stipulation had not specifically described this type of

activity as a racketeering activity of the enterprise, it would be evident

49

on the facts that it was. A person acts on behalf of the group if he "'acted for the group and/or in concert with other members, or acted in ways that contributed to the purposes of the group, or that were facilitated or made possible by the group.'" *Odum*, 878 at 517 (quoting *Feliciano*, 223 F.3d at 117). Reynolds was a member of the Short North Posse and a part of the enterprise, and Holt acted in concert with him. While Holt argues on appeal that Reynolds was acting on his own, not for the enterprise, the jury was entitled to conclude that the Battle robbery advanced the purpose of the group—in particular, that it was intended to yield money and/or drugs for enterprise members and associates and to expand the organization's activity and influence. The district court relied on similar reasoning in its rejection of the Rule 29 motion. (R. 1524, Trial Transcript, 16091 (noting "that it was the MO of the Short North Posse and Mr. Reynolds, as a part of the Short North Posse, to rob drug dealers. And so, when they went to the Battle residence, that was the point of it.").) Reynolds' robberies, and his recruitment of participants, were enhanced and enabled by his membership in the Short North Posse gang and the overall enterprise: Wharton and Bowers, who performed robberies with Reynolds, knew that Reynolds

was a member of the Short North Posse, and Wharton testified that "everybody knows they rob people." (R. 1520, Trial Transcript, 15526, 15530-31, 15534-35, 15601.) Bowers considered the robberies he did with Reynolds to be robberies that he did "with the Short North Posse." (R. 1521, Trial Transcript, 15756-57, 15765.) Wharton identified other participants in these robberies as being members or associates of the Short North Posse. (R. 1520, Trial Transcript, 15527-30.) And Wharton testified that he "got in" Reynolds' crew by participating in his first robbery. (*Id.* at 15530 ("[M]e and Johnathan was just chilling and Lance called him for something. And that's when I got in, and it just so happened to be a robbery on a grow house.").)

Second, there was sufficient evidence for a jury to conclude that Holt committed the murder to maintain his position as an enforcer within the enterprise. The jury heard evidence of Holt's participation as "enforcer" in several previous robberies.  The evidence further showed that the robberies—including that of Battle—were orchestrated by Reynolds. Taken together, this evidence was sufficient to allow the jury to conclude that Holt participated in the Battle offense at least in part to maintain or increase his role as an enforcer in such offenses. *See*

*Carson*, 455 F.3d at 370; *United States v. Moore*, 651 F.3d 30, 98 (D.C. Cir. 2011).

Third, even if a jury concluded that Holt's regular participation did not amount to having a position in the enterprise, there was sufficient evidence for a jury to conclude that he committed the murder to gain entrance into the enterprise. Wharton's testimony describes Reynolds as a desirable criminal connection, and he signaled his own desire to commit crimes with Reynolds and other people associated with the Short North Posse by participating in a robbery. (*Id.* at 15526, 15530-31, 15534-35, 15601.)

### b. *Pecuniary value from the enterprise*

First, there was sufficient evidence that Holt committed the murder *for compensation*. Holt participated in and received compensation for previous robberies arranged by Reynolds, and one participant of those previous robberies testified that it was their practice to split the proceeds among participants. (R. 1520 Trial Transcript, 15538-39; R. 1521, Trial Transcript, 15757, 15761, 15765-69.) The attempted robbery of Battle shared several characteristics with previous robberies: It was arranged by Reynolds, was the robbery of a

drug dealer, and involved participation by Wharton and Kenney. (R. 1520, Trial Transcript, 15551-52, 15562-63; R. 1521, Trial Transcript, 15771.) The jury was entitled to infer that Holt committed this robbery, too, as consideration for something of "pecuniary value"—namely, a share of the anticipated proceeds.

Second, there was sufficient evidence that Holt committed the murder for compensation *from the enterprise.* Reynolds was an undisputed member of the enterprise. The evidence supported a conclusion, as described in the previous section, that Reynolds was acting as part of the enterprise in organizing the crime.

Third, because Holt committed the underlying robbery with a pecuniary purpose, and because his actions constitute at a minimum a felony murder, he had the relevant purpose for the purpose of VICAR. *See Mapp*, 170 F. 3d at 335-36 (where murder in aid of racketeering is felony murder, element of purpose or motivation is only required with respect to the underlying felony).

Fourth, Holt's status within the enterprise is irrelevant to the finding of pecuniary motive. *See, e.g., United States v. Muyet*, 994 F. Supp. 501, 515, 519 (S.D.N.Y. 1998) (sufficient evidence to convict on

"compensation" VICAR theory although defendant was a "freelancer"),

*aff'd* Nos. 98-1421 et al., 2000 WL 1275925, *4 (2d Cir. Sept. 8, 2000).

Holt's sufficiency argument therefore fails.

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

BENJAMIN C. GLASSMAN
United States Attorney


/s/ Kimberly Robinson
KIMBERLY ROBINSON
Assistant United States Attorney
303 Marconi Boulevard
Suite 200
Columbus, Ohio 45215
(614) 469-5715
kim.robinson@usdoj.gov

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation provided in Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure. The brief contains 10,285 words of Century Schoolbook (14 pt) proportional type. Word 2016 is the word-processing software that I used to prepare this brief.

/s/ Kimberly Robinson
KIMBERLY ROBINSON

# DESIGNATION OF RELEVANT DISTRICT COURT RECORDS

The following are relevant under Sixth Circuit Rule 30(g).

| Record number | Description | PAGE ID# range |
|---|---|---|
| 300 | superseding indictment | 1150–1243 |
| 612 | motion to suppress | 2564–2579 |
| 775 | order | 3575–3590 |
| 1090 | transcript | 8731–8822 |
| 1324 | motion | 13966–13967 |
| 1328 | order | 13974–13975 |
| 1346 | stipulation | 14082–14091 |
| 1413 | judgment | 14397–14402 |
| 1417 | notice of appeal | 14433–14434 |
| 1520 | transcript | 15363–15612 |
| 1521 | transcript | 15613–15822 |
| 1524 | transcript | 16048–16238 |

## CERTIFICATE OF SERVICE

I certify that this Brief for Plaintiff-Appellee United States was served on counsel for Defendant-Appellant Johnathan Holt by filing with the Court's CM/ECF system this 21st day of February, 2018.


/s/ Kimberly Robinson
KIMBERLY ROBINSON